

ORIGINAL

DAVIS LEVIN LIVINGSTON GRANDE

THOMAS R. GRANDE   3954-0
400 Davis Levin Livingston Grande Place
851 Fort Street
Honolulu, Hawai'i 96813
Telephone:  (808) 524-7500
Facsimile:  (808) 545-7802

BRONSTER CRABTREE & HOSHIBATA

JEFFREY P. CRABTREE     3405
ROBERT M. HATCH          7724
Pauahi Tower
1001 Bishop Street, Suite 2300
Honolulu, Hawai'i  96813
Telephone:  (808) 524-5644
Facsimile:  (808) 599-1881

Attorneys for Plaintiffs

FILED IN THE
UNITED STATES DISTRICT COURT
DISTRICT OF HAWAII

OCT 02 2003
FILED IN THE
UNITED STATES DISTRICT COURT
at ___ o'clock and ___ min ___ M.
WALTER A. Y. H. CHINN, CLERK

OCT 02 2003

at 3 o'clock and 51 min ___
WALTER A. Y. H. CHINN, CLERK

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF HAWAI'I

| | |
|---|---|
| Association of Apartment Owners of The Bougainville, Board of Directors of Association of Apartment Owners of The Bougainville, individually and on behalf of all others similarly situated,<br><br>            Plaintiffs,<br><br>   vs. | Civil No. CVO3 00312 HG BMK (Class Action)<br><br>PLAINTIFFS' OPPOSITION TO DEFENDANT STATE FARM FIRE INSURANCE COMPANY'S MOTION TO DISMISS FOR FAILURE TO STATE A CLAIM UPON WHICH RELIEF CAN BE GRANTED AND FOR LACK OF |

| | |
|---|---|
| State Farm Insurance; John Does 1-10, Jane Does 1-10, Doe Corporations 1-10, Doe Partnerships 1-10 and Doe Governmental Entities 1-10,<br><br>Defendants | SUBJECT MATTER JURISDICTION; CERTIFICATE OF SERVICE<br><br>Date: October 20, 2003<br>Time: 9:00 a.m.<br>Judge: Magistrate Judge<br>Helen Gilmore |

**PLAINTIFFS' OPPOSITION TO STATE FARM FIRE CASUALTY COMPANY'S MOTION TO DISMISS FOR FAILURE TO STATE A CLAIM UPON WHICH RELIEF CAN BE GRANTED AND FOR LACK OF SUBJECT MATTER JURISDICTION**

## I.    INTRODUCTION

The Court should deny Defendant State Farm Fire and Casualty Company's Motion to Dismiss for Failure to State a Claim Upon Which Relief Can Be Granted and For Lack of Subject Matter Jurisdiction because this Court is the only available forum for Plaintiffs' claims and Plaintiffs have stated a claim for relief.

## II.    STATEMENT OF FACTS

### A.    State Farm's Overinsurance of Plaintiffs' Condominium.

Defendant sold Plaintiffs property damage insurance on their condominium. Complaint, ¶ 16. Defendant included a provision in Plaintiffs' insurance policy that caused the amount listed as the Limits of Insurance for Coverage on the annual Declaration to automatically increase

each year. Complaint, ¶ 2. When the Policy began in 1984, the amount of

Defendant's listed valuation of the property was $17,862,808. Complaint, ¶

16. By 2001, the listed valuation had risen to $30,990,700. *Id.* When

Plaintiffs became concerned that their premiums had risen dramatically

throughout the 1990s while property values had not, they questioned

Defendant's valuation. Complaint, ¶ 18. Defendant admitted that an

accurate valuation would be only $19,000,000. *Id.* Even though Defendant

listed the value as high as $30,000,000 and calculated Plaintiffs' premiums

based on this figure, the terms of the Policy purported to limit Defendant's

exposure to the actual replacement value, and not the value listed by

Defendant. *See* Dec. of J. Steiner, Exhibit B ("Policy"), pp. 17-18. Thus,

Defendants systematically charged Plaintiffs for an amount of coverage that

it never actually provided. *Id.*

**B.    The State Farm Policy.**

Plaintiffs' Policy (contrary to Defendant's assertions in its motion and

memorandum) provides both "actual cash value" coverage AND a

"replacement cost" coverage. In section 1 entitled, "Property Coverages,

Coverage A, Buildings," it states:

> When a limit of insurance is shown in the
> Declarations for Coverage A, we will pay for
> accidental direct physical loss of buildings at the

premises described in the Declarations caused by
an insured loss.

Policy, p. 2.

The Declarations for the 1997-98 policy year lists as the "Limits of Insurance" $28,715,300 for "Coverages and Property…Buildings." *Id.* (Declarations Page). Thus, under the terms of its policy, Defendant will pay for "direct physical loss of buildings." *See also* Policy at 4 ("**Losses Insured** We insure for accidental direct physical loss to property covered under this policy…")(bold in original). The Policy specifically provides the insured "may make a claim for loss covered by this insurance on <u>an actual cost basis.</u>" Policy, p. 8 (emphasis added).

### C.    State Farm's Automatic Inflation Index.

Defendant's Inflation Coverage provision, which it admits it applies to all condominium associations in the state of Hawai'i provides as follows:

> The limits of insurance specified in the Declarations of this policy for Coverage A – Buildings and Coverage B – Business Personal Property will automatically increase by the applicable Inflation Coverage Index shown in the Declarations.
>
> To determine the limits of insurance on a particular date, the index level available on that date will be divided by the index level as of the effective date of this inflation coverage provision and the resulting factor multiplied by the limits of insurance for Coverage A and Coverage B separately.  In no event will the limits of insurance be reduced to less than those shown in the Declarations or most recent renewal notice, whichever is greater.

> If during the term of this policy the limit of insurance for Coverage A or Coverage B is changed at your request, the effective date of this inflation coverage provision is amended to coincide with the effective date of such change.

Policy at 4.

The effect of Defendant's automatic placement of an inflation index is dramatic. The provision results in the automatic increase of the limits of liability without regard to the actual cash value or the replacement cost of the property being insured. It results in overinsurance for Representative Plaintiffs (and for all other class members) because the Inflation Coverage Index increases every year, while actual cash value or replacement cost may remain constant, or even decline.

## III.    ARGUMENT

Defendant argues Plaintiffs' Complaint should be dismissed for failure to state a claim because HRS § 431:10E-102 does not apply to Plaintiffs' Policy and, therefore, the inflation clause was legal. Defendant's argument is wrong because HRS § 431:10E-102 does apply to Plaintiffs' Policy; but it is also wrong because even if the statute did not, Defendants' conduct is a violation of Chapter 480 and gives rise to the common law remedies Plaintiffs seek.

In the alternative, Defendant claims the Court lacks subject matter jurisdiction because Plaintiffs should have brought their claims before the

Insurance Commissioner before bringing them in court. Defendant is wrong because the Insurance Commissioner has no jurisdiction to hear any of Plaintiffs claims; and even if he could, he has no jurisdiction to affect Defendant's existing and past policies of insurance such as those at issue in the present action.

### A.    HRS § 431:10E-102 Applies To Plaintiffs' Policy.

HRS § 431:10E-102 prohibits insurers, such as Defendant, from "selling" insurance in excess of the "actual cash value" of the property insured when issuing or renewing a policy. Defendant sold Plaintiff insurance based on its valuation of Plaintiffs' property at over $30,000,000, but it later acknowledged that the property's replacement value was only $19,000,000. What Defendant did is precisely what the overinsurance statute was designed to prohibit. Nevertheless, Defendant seeks to insulate itself from liability for its misconduct by a strained construction of the statute and a selective interpretation of the terms of the policy it issued to Plaintiff. Defendant's arguments are wrong and should be rejected.

**1.    HRS § 431:10E-103 does not exempt Defendant's inflated valuation of Plaintiffs' property from the prohibition on overinsurance in HRS § 431:10E-102.**

Defendant argues that section 431:10E-103 completely exempts

Plaintiffs' entire policy from the provisions of section 431:10E-102.[1]

---

[1]    HRS § 431:10E-102 states:

Overinsurance prohibited; exceptions.
(a) Over-insurance shall be deemed to exist if property or an insurable interest in the property is insured by one or more insurance contracts against the same hazard <u>in any amount in excess of the actual cash value of the property or of such interest, as determined as of the effective date of the insurance or of any renewal thereof</u>.
(b) For the purposes of this section only, <u>the term actual cash value means the cost of replacement</u> less such depreciation as is properly applicable to the subject insured.
(c) <u>No person shall knowingly sell, solicit, negotiate, or make</u> any contract for insurance which would result in over-insurance of the property or interest therein proposed to be insured, except as is provided in section 431:10E-103.
(d) Each violation of this section shall subject the violator to the penalties provided by this code.
(emphasis added)

HRS § 431:10E-103 states:

Exceptions.
Section 431:10E-102 does not apply to:
(1) Insurance on buildings and building service equipment pertaining thereto and part thereof, and machinery, tools, and other equipment appurtenant to or used in connection with any trade, business, manufacturing process, governmental operations, or public and private institutions, and household furniture and furnishings in dwelling houses, with respect to the difference between the actual value of the insured property <u>at the time any loss or damage occurs and the cost of repairing, rebuilding, or</u>

Defendant's argument is contrary to the plain language of sections 102 and 103.

Section 102 applies to all property insurance and is concerned with the valuation of the insured property "as determined as of the effective date of the insurance or any renewal thereof." Section 102 defines the "actual cash value" as the "cost of replacement," and prohibits insurance for values greater than that.

Applying its automatic inflation clause on an annual basis, Defendant calculated premiums based on stated values for Plaintiffs' property that rose from $17,862,808 to $30,990,700 between 1984 and 2001. ¶ 16. Nevertheless, in 2001, Defendant admitted that the "actual replacement value" of the property was not over $19,000,000. ¶ 18. This was clearly a violation of section 102 because $30,990,700 is a value greatly in excess of $19,000,000.

---

replacing with new materials of like size, kind and quality, such property as has been damaged or destroyed by fire or other peril insured against.

(2) Insurance against the cost of demolition or reconstruction, or both, of any portion of the insured premises which has not suffered damage, and the additional cost of repair or reconstruction, or both, of portions of the insured premises which have suffered damage, necessary to comply with applicable laws or ordinances.

(emphasis added)

Section 103 has no application to the present action because it is not concerned with valuation and never applies until after a loss has occurred. Section 103 applies only "at the time any loss or damage occurs," and then only to "the costs of repairing, rebuilding, or replacing with new materials … such property as has been damaged or destroyed." Section 103 is not concerned with valuation of the insured property at all. Section 103 simply creates a limited exception for actual repair costs if and when a loss occurs. This just means that a policy will not be deemed to be overinsurance if, when a loss has occurred and a claim is actually made, the policy either pays an actual value in excess of repair costs or pays repair costs in excess of actual value.

To read the provisions as Defendant suggests would mean that any policy of insurance that provided coverage for any repair costs would be automatically and completely exempt from section 102's prohibition on overinsurance. This would lead to the absurd result that a policy could provide a cost of repair provision and thereby allow an insurer to also insure the property for several times its actual cash value. The statute should not be construed to defeat its own purpose. *Richardson v. City & County of Honolulu*, 76 Haw. 46, 60, 868 P.2d 1193, 1207, *recon. denied*, 76 Haw. 247, 871 P.2d 795 (1994) ("This court has recognized that departure from a

9

literal construction of a statute is justified when such construction would produce an absurd ... result and the literal construction in the particular action is clearly inconsistent with the purposes and policies of the act. ").

The inflated property values that Defendant quoted to calculate Plaintiffs' premiums were "determined" by Defendant "as of the effective date of the insurance" and at the time of each "renewal thereof." HRS § 431:10E-102(a). They were not reimbursements for "the cost of repairing" what Plaintiff actually spent "at the time of any loss." HRS § 431:10E-103(1). They are thus plainly covered by section 102 and not subject to the limited exception as defined in section 103.

> **2.     Defendant's argument rests on a false distinction between "actual cash value" and "replacement value."**

Defendant's argument depends on its assumption that all policies of insurance can be neatly divided into two separate and distinct categories: "actual cash value" policies and "replacement value" policies. Mem., p. 6. Defendant then claims that section 102 applies only to "actual cash value policies." Defendant concludes that Plaintiffs' Policy was not an "actual cash value" policy and, therefore, section 102 cannot apply to it in any way.

Defendant is wrong because Plaintiffs' Policy also covered "actual cash value." The Policy shows there is no clear distinction between policies

covering only "actual cash value" and those covering only "replacement value." For example, in the event of a claim by Plaintiffs, Defendant reserved for itself the right at its sole discretion to "take all or any part of the property at an agreed or appraised value" in satisfaction of the claim. Policy, p. 15. Thus, if Plaintiffs suffered a total loss, Defendant could unilaterally choose to pay Plaintiffs the actual value of the property lost.

In the alternative, Defendant could choose to pay Plaintiffs the "value" of the lost property. *Id.* In that case, Plaintiffs could elect to calculate "value" as the "actual cash value." Policy, p. 16. Thus, Plaintiffs' own Policy allowed for either the insured or the insurer to define the coverage provided as "actual cash value."[2] Plaintiffs' Policy is, thus, as much an "actual cash value" policy as it is a "replacement value" policy.

Just as insurance policies cannot be as neatly categorized as Defendant assumes, sections 102 and 103 cannot be either. Section 102(b), itself, defines "actual cash value" as "the <u>cost of replacement</u> less such depreciation as is properly applicable to the subject insured." (emphasis added). If, as Defendant argues, section 102 were not intended to apply to

---

[2]    In reliance upon "the special skill and knowledge of State Farm," Plaintiffs believed that the "value of the property" was the amount that Defendant listed as the coverage amount each year (i.e., $30,990,700 in 2001). ¶¶ 16, 19. As it turned out, of course, the actual cash value was only $19,000,000. ¶ 18.

policies providing "replacement value" coverage, it would not define overinsurance by reference to "the cost of replacement." The section is obviously not intended to draw a dichotomy between "cash value" and "replacement value" policies as Defendant proposes.

Contrary to Defendant's arguments, the universe of insurance policies cannot be neatly divided between those where valuation is based on replacement value and those where it is based on actual cash value. Indeed, Plaintiffs' Policy shows the folly of this construction because it shows that an insurer could always sell a policy with actual cash value coverage in excess of the limits of section 102 by simply adding a repair coverage option.[3]

Defendant's argument that Plaintiffs' Policy is exempt from section 102 because it is a "replacement value" policy is thus contrary to the plain terms of the Policy and the language of sections 102 and 103 and should be rejected. Whatever section 103 was intended to allow, it was certainly not intended to allow an insurer such as Defendant to value property greatly in

---

[3]    The repair coverage option would be illusory because with a huge inflated actual value coverage provision, the insured would always select actual value in the event of a total loss. Under Defendant's construction of the statutes, the very evil that Defendant claims overinsurance statutes are designed to prevent, burning buildings for profit, Mem., pp. 10-11, would be allowed so long as the policy contained a repair coverage provision.

excess of its actual value and calculate premiums based on such a grossly

inflated figures. Defendant's motion to dismiss should, therefore, be

denied.[4]

**B.    Plaintiffs Do Not Assert A Private Right Of Action Under HRS § 431:10E-102.**

Defendant argues that section 102 cannot be directly enforced by

means of a private right of action. Mem., pp. 14-18. Even though Plaintiff

alleges that Defendant violated section 102 and this is relevant to the causes

of action Plaintiff has alleged, Plaintiff does not seek to enforce a private

right of action directly under section 102.

---

[4]    Defendant also claims that the purpose of section 102 is not to protect insureds but to protect "insurers from fraud." Mem., p. 11. Defendant argues this makes section 102 analogous to statutes in other states. *Id.* Defendant's argument is completely inconsistent with the plain language of section 102(e) which provides, "No person shall knowingly sell, solicit, negotiate, or make any contract for insurance which would result in over-insurance." The statute is thus, plainly not directed at insured consumers who buy policies but at insurance companies such as Defendant who sell them. This sets Hawai'i statutes apart from those cited by Defendant and renders the statutes of other states of no guidance in the present action.

**C.    Even if Section 102 Did Not Apply To Plaintiffs' Policy, Plaintiffs Have Stated Claims For Relief Under Chapter 480 And The Common Law.**

Defendant asserts without explanation that if section 102 does not apply to Plaintiffs' Policy, all of Plaintiffs' claims must automatically fail. Mem., p. 40.  Under Rule 12(b)(6), however, Defendant must demonstrate to a certainty that plaintiff "would be entitled to no relief under any state of facts that could be proved," and all allegations of material fact must be accepted as true and construed in the light most favorable to the plaintiff. *Fidelity Fin. Corp. v. Federal Home Loan Bank*, 792 F.2d 1432, 1435 (9th Cir. 1986), *cert. denied*, 479 U.S. 1064 (1987); *Stender v. Lucky Stores, Inc.*, 766 F. Supp. 830, 831 (N.D. Cal. 1991).

Systematically selling insureds illusory coverage and charging grossly excessive premiums would clearly seem to be a sufficient allegation of wrongdoing to state a claim under Chapter 480 and the common law. Plaintiffs' claims do not turn on section 102.  Section 102 simply illustrates the strong public policy of the State of Hawaiʻi against the type of conduct engaged in by Defendant.

14

**D.    The Court Should Not Defer Considering This Case To Allow An Action Before the Insurance Commissioner Because The Commissioner Cannot Provide Any Relief Or Relevant Expertise To An Issue Of Fact.**

Defendant claims Plaintiffs' claims should be barred by the filed rate doctrine, but Defendant is wrong because Plaintiffs challenge Defendant's inflated valuation of their insured property (*i.e.*, the quantity of insurance purchased) and not the rate Defendant charged.  Defendant also argues the Plaintiffs should have filed an action with the Insurance Commissioner before filing suit.  Because there are no remedies available to Plaintiffs from the Insurance Commissioner for the claims in this case, it would not be feasible for Plaintiffs to have brought their claims elsewhere.  This case, therefore, properly belongs before this Court and should be resolved here.

**1.    The filed rate doctrine does not apply because Plaintiff does not seek recovery based on a retroactive reduction in the rate he was charged for insurance.**

Defendant argues that the "filed rate" doctrine bars Plaintiffs' claims.  Mem., pp. 22-24.  Defendant is wrong because Plaintiff does not seek to alter the rates Defendant charged for insurance.

A rate is "Proportional or relative value; the proportion by which quantity or value is adjusted."  Black's Law Dictionary, rate (7th ed. 1999).  Similarly, HRS § 431:14-101.5 states, "'Rate' means the cost of insurance per exposure unit."  Plaintiff does not seek any retroactive reduction in the

rate Defendant charged for insurance but, rather, seeks a refund of

Defendant's inflation of the value (*i.e.*, "exposure unit") to which the rate

was applied.  In other words, Plaintiff does not object to Defendant's rates

but the quantity of insurance Defendant sold.  Because Defendant's rates are

not at issue in this case, the filed rate doctrine does not apply.[5]

The filed rate doctrine was created by the Supreme Court in *Keogh v.*

*Chicago Northwestern Railway Co.*, 260 U.S. 156 (1922).[6]  The *Keogh* Court

believed the doctrine was necessary to preserve the "paramount purpose of

---

[5]    Even if Plaintiffs were challenging a filed rate, the doctrine would not
bar their claims because even a filed rate can be challenged if it violates a
statute. *Burke v. First Unum Life Ins. Co.*, 975 F. Supp. 310, 316 (S.D.N.Y.
1997) (provision in insurance policy form approved by insurance
commissioner was subject to court action alleging the provision violated an
insurance statute); *Peachtree Casualty Ins. Co., Inc. v. Sharpton*, 768 So.2d
368, 373 (Ala. 2000) (same).  As in *Burke* and *Peachtree*, the mere approval
of the policy form that contained the inflation clause does not bar a direct
action alleging the clause violated a statute.

[6]    While federal case law requires application of the doctrine to federally
regulated rates, the question of whether the doctrine should apply to rates
regulated by a state body is wholly a question of state law. *Knevelbard Dairies
v. Kraft Foods, Inc.*, 232 F.3d 979, 993 (9th Cir. 2000); *Pink Dot, Inc. v.
Teleport Communications Group*, 89 Cal. App. 4th 407, 416, 107 Cal. Rptr. 2d
392, 398 (2d Dist. 2001).  No published decision applying Hawai'i law has ever
adopted or applied the filed rate doctrine.  Even states that have adopted the
doctrine have declined to apply it as expansively as some federal courts have.
*Id.*  There is no reason to presume that Hawai'i courts would adopt the doctrine
or adopt it as expansively as some other courts have.  Nevertheless, because the
doctrine clearly does not apply to Plaintiffs' claims, no matter the standard, the
Court need not reach this difficult issue of first impression.

Congress" when creating the Interstate Commerce Commission: the "prevention of unjust discrimination" in rates charged for shipments by rail. 260 U.S. at 163. The Court reasoned that if one shipper were allowed to retroactively obtain a lower rate through antitrust litigation, it would threaten the anti-discriminatory purpose of the Act because it would grant that shipper a lower rate than the rate approved by the Commission. *Id.*

The filed rate doctrine should, thus, only be applied to preserve the uniform application of a rate that has been determined to be reasonable by a regulatory agency. *Gelb v. American Telephone and Telegraph Co.*, 813 F. Supp. 1022, 1028 (S.D.N.Y. 1993) ([C]ourts should refrain from disturbing the uniformity of rates required by statute and enforced by the administrative agency."). It should not be applied to plaintiffs who are not seeking relief that will require the court to reevaluate the reasonableness of a rate. *Litton Systems, Inc. v. American Telephone & Telegraph Co.*, 700 F.2d 785, 820 (2d Cir. 1983), *cert. denied*, 464 U.S. 1073 (Filed rate doctrine inapplicable "because the issue here is not the reasonableness of the interface tariff rate as compared to some other rate that might have been charged, but instead whether … there should have been any charge at all."); *Gelb*, 813 F. Supp. at 1031.

Plaintiffs' claims in the present case do not require the Court to reevaluate the reasonableness of Defendant' s rates. Plaintiffs claim that

Defendant wrongly inflated its valuation of Plaintiffs' property to which it applied its rates to calculate an annual premium, not that Defendant raised the rates themselves. ¶ 16.

The distinction between rate and quantity in the context of a filed rate defense was explained in *Empire West v. Southern California Gas Co.*, 12 Cal. 3d 805, 528 P.2d 31, 117 Cal. Rptr. 423 (1974). Plaintiff, the owner of an apartment building, sued defendant, a natural gas supplier for fraud. The plaintiff claimed that the defendant induced it to install a natural gas system for the building based on an erroneous estimate of the amount of gas that the building would consume. The defendant asserted the filed rate doctrine as a defense. The court rejected the defendant's argument drawing a distinction between a rate and the quantity to which it is applied:

> By contrast the instant case does not involve a dispute over the Rate which plaintiff must pay defendant for gas service. Plaintiff has not asserted that defendant misrepresented the legal rate set forth in a published tariff, nor does plaintiff seek a reduced rate, rebate, or refund. Instead plaintiff contends that defendant misrepresented the Quantity of gas [] the proposed building project would consume, resulting in a substantial understatement of Plaintiffs' total cost for gas service.

*Empire West*, 12 Cal. 3d at 810, 528 P.2d at 33-34, 117 Cal. Rptr. at 425-26.

This case, like *Empire West*, involves quantity, not rates, and, so, the filed rate doctrine does not apply.

## 2.    The cases cited by Defendant are Inapposite.

In contrast to the present case, none of the cases cited by Defendant involved an issue of quantity.  In each case, the plaintiff sought damages based on the retroactive application of a lower rate than the one approved.  Thus, the relief sought directly challenged the amount of a rate approved by a regulator.

Three of the cases challenged filed rates based on allegations that the defendant had made misrepresentations to the regulatory body in order to obtain approval of unreasonably high rates.  *Calico Trailer Manufacturing Co., Inc. v. Insurance Co. of North America*, 1994 WL 823554 (E.D. Ark. Oct. 12, 1994); *N.C. Steel, Inc. v. National Council on Compensation Ins.*, 347 N.C. 627, 496 S.E.2d 369 (1998); *In re Empire Blue Cross and Blue Shield Customer Litig.*, 164 Misc. 2d 350, 622 N.Y.S.2d 843 (N.Y. Sup. Ct. 1994), *aff'd sub nom.*, *Minihane v. Weissman*, 226 A.D.2d 152, 640 N.Y.S.2d 102 (N.Y. App. Div. 1996).  The measure of damages sought by the plaintiffs was retroactive application of a lower rate.  *Calico*, 1994 WL 823554 at *6; *N.C. Steel*, 347 N.C. at 630, 496 S.E.2d at 371; *Empire*, 164 Misc.2d at 358, 622 N.Y.S.2d at 848 ("[I]n order to determine the damages plaintiffs seek this Court would be required to determine what would be a reasonable rate absent the fraudulent misrepresentations made to [the New York regulator that approved  the rates charged].").

In *Horwitz v. Bankers Life and Cas. Co.*, 319 Ill. App. 3d 390, 408, 745 N.E.2d 591, 605 (1st Dist. 2001), the plaintiffs also sought to have the court "ascertain what would be a reasonable rate absent the alleged fraud." Similarly in *Arkansas Louisiana Gas Co. v. Hall*, 453 U.S. 571 (1981), the plaintiff, a supplier of natural gas, sought to retroactively obtain a higher rate from defendant, its customer, because the defendant's fraud supposedly prevented it from applying for higher rates that would have been approved if filed. Each of these cases clearly and directly challenged the regulator's approval of a specific rate.

Defendant also relies on *Allen v. State Farm Fire and Cas. Co.*, 59 F. Supp. 2d 1217, 1220 (S.D. Ala. 1999), where the Defendant applied for and obtained approval from Alabama's insurance commissioner to calculate a deductible as a percentage of coverage for hurricane insurance in coastal areas. The plaintiff challenged the reasonableness of the percentage deductible. The court held that the reasonableness of the percentage deductible was subject to the filed rate doctrine because to strike the deductible would "necessarily affect[] a decrease in the defendants' effective rates and disturb[] the commissioner's rate-making authority. 59 F. Supp. at 1229. The court explained that the deductible and rate are "equivalent" because the Defendant's purpose in filing the proposed change in the deductible was to obtain approval

of a certain rate.  59 F. Supp. at 1229 n.5 (citing *State Farm Mut. Auto. Ins. Co. v. Department of Public Advocate*, 118 N.J. 336, 356, 571 A.2d 957, 967 (1990)).[7]

The present case is different than *Allen* because Defendant's inflated valuation of Plaintiffs' property does not, like a percentage deductible, have any impact on the reasonableness of a proposed rate.  Both a percentage deductible and a rate are a component of "the proportion by which quantity or value is adjusted."  Black's Law Dictionary, *supra*.  Defendant's inflated valuation of Plaintiffs' property is the "quantity" and not a "proportion by which quantity … is adjusted."  *Id.*

As in *Empire West*, and unlike the cases relied upon by Defendant, the present case involves the quantity to which the approved rate was applied

---

[7]    Although *State Farm* was not a filed rate case it was concerned with the process of filing and approval of insurance rates and which parts of a filed policy were related to "rates."  The court explained why deductibles are equivalent to rates for filing purposes as follows:

> As to such forms filings an insurer can well assert that not only are they not submitted in order to gain approval to change rates, they may, in fact, result in no change in rates. Thus we believe that there is an area of the Commissioner's regulatory activity requiring action on the part of insurers that is not properly to be regarded as an effort by the insurer to change rates. On the other hand it is equally true that some prescribed filings should be so regarded. For example, changes in deductibles would usually have the effect of raising rates.

118 N.J. at 356, 571 A.2d at 967.

and not the rate itself. Plaintiff does not seek to have a lower rate applied to the coverage it purchased as in the cases cited by Defendant. Thus, the filed rate doctrine should not be applied.

### 3. Defendant's filings and policy terms did not "mandate" it to break the law.

Defendant also claims that it was "mandated" to inflate Plaintiffs' insured property value because it included the inflation factor in its filing with the Commissioner. Mem., p. 21, 25. However, the inflation factor Defendant filed did not mandate anything. It simply said, "Policy amounts are automatically changed to recognize increases in inflationary effects. Policy amount increases are based on local construction costs as provided by American Appraisal (Boeckh) for building coverage and CPI for contents." Mem., p. 20, Ex. C. As applied by Defendant, the inflation factor did not accurately "recognize" actual increases in "local construction costs." Complaint, ¶ 16. Defendant itself acknowledged that $19,000,000 was a more accurate figure than the $30,990,700 figure that resulted from perennial application of its automatic inflation factor. Complaint, ¶¶ 16, 18. This $11,000,000 over valuation hardly seems "mandated" by Defendant's filing.

Similarly, the Policy itself, contemplates changing the limits notwithstanding the inflation provision. Mem., Ex. B, p. 4 ("If during the

term of this policy the limit of insurance … is changed at your request …").

Moreover, nothing mandated Defendant to renew the policy at ever

increasing amounts in violation of law just because it included an automatic

inflation clause that was wildly out of synch with local conditions. It was

incumbent upon Defendant to accurately value the property in light of reality

rather than continuously charge for increasingly excessive coverage.

Complaint, ¶ 19. Nothing Defendant filed excuses its conduct.

> **4.    Plaintiff need not exhaust administrative remedies
> because none are available for the claims he brings in
> the present action.**

Defendant argues that Plaintiffs' claims must be dismissed because

Plaintiff failed to exhaust available administrative remedies prior to filing

suit. Mem., pp. 25-30. Defendant's argument is meritless because there are

no administrative proceedings available to pursue the remedies Plaintiff

seeks in the present action.

"The doctrine of administrative remedies in the field of administrative

law holds that where a remedy is available from an administrative agency,

that remedy must be exhausted before the courts will afford relief." *Pele*

*Defense Fund v. Puna Geothermal Venture,* 9 Haw. App. 143, 151, 827 P.2d

1149, 1154 (1992). "Where the administrative machinery is not provided,

the power of the court is not ousted by a claim of failure to exhaust

administrative remedies." *Id.* Thus, "[a]n aggrieved party need not exhaust

administrative remedies where no effective remedies exist." *Hokama v.*

*University of Hawai'i*, 92 Haw. 268, 273, 990 P.2d 1150, 1155 (1999).

The only administrative remedy that Defendant identifies is H.R.S.

§431:14-106(d) which allows one to file a challenge to the legality of a rate

filing by an insurance company with the Insurance Commissioner.

However, section 431:14-106(d) only allows a challenge based on a failure

to comply with some provision of Article 14 of the Insurance Code. H.R.S.

§431:14-106(d)(4).[8] Moreover, even if the Commissioner finds a violation

---

[8] Section 431:14-106 (d) provides:

(1) Any person or organization aggrieved with respect to any filing which is in effect may make written demand to the commissioner for a hearing thereon; provided, however, that the insurer or rating organization which made the filing shall not be authorized to proceed under this subsection.

(2) The demand shall specify the grounds to be relied upon by the aggrieved person or organization and such demand must show that such person or organization has a specific economic interest affected by the filing.

(3) If the commissioner finds that the demand is made in good faith, that the applicant would be so aggrieved if the person's or organization's grounds are established, and that the grounds otherwise justify such a hearing, the commissioner shall, within thirty days after receipt of the demand, hold a hearing. The hearing shall be held upon not less than ten days' written notice to the aggrieved party and to every insurer and rating organization which made such filing.

(4) If, after the hearing, the commissioner finds that the filing does not meet the requirements of this article, the commissioner shall issue an order specifying in what respects the filing fails to meet the requirements of this article, and stating when, within a reasonable period, the filing shall be deemed no longer effective. Copies of the order shall be sent to the applicant and to every such insurer and rating organization. The order shall not affect

of Article 14, the only relief the Commissioner may grant is an order declaring the filing no longer effective at a specified date in the future, and this order may not "affect any contract or policy made or issued prior to the expiration of the period set forth in the order." *Id.* Thus, even if Plaintiff were to file a challenge with the Insurance Commissioner and the Commissioner were to issue a favorable order, it could not affect the contracts at issue in this case because they were already "made or issued" prior to any date the Commissioner could put in the Order. Complaint, ¶ 16. In addition, the Commissioner clearly could not consider Plaintiffs' claims under section 480-2, for Unjust Enrichment, Restitution, Disgorgement or Punitive Damages because they are outside the scope of his authority to enforce Article 14. HRS § 431:14-106(d)(4).

Plaintiffs seek money damages because Defendant charged it premiums based on inflated property valuations applied to insurance contracts that were made or issued by Defendant in the past. Complaint, ¶ 16, pp. 12-13. In addition, Plaintiffs seek recovery under common law and statutory theories of recovery that are beyond the Commissioners limited jurisdiction. Thus, even if Plaintiffs filed a challenge with the Insurance Commissioner, they could not

---

any contract or policy made or issued prior to the expiration of the period set forth in the order.

obtain any of the remedies they seek in the present action. Because there are no "effective administrative remedies available to Plaintiffs the doctrine of exhaustion cannot apply to their claims.

> **5.** **The doctrine of primary jurisdiction does not apply to this case because the Insurance Commissioner does not have concurrent original jurisdiction to hear Plaintiffs' claims and there are no complex issues of fact requiring administrative expertise.**

As a threshold matter, the doctrine of primary jurisdiction only applies where an administrative body has "concurrent original jurisdiction" for an action by the plaintiff to resolve issues that are before the court. *Hawai'i Blind Vendors Ass'n v. Department of Human Services*, 71 Haw. 367, 371, 791 P.2d 1261, 1264 (1990); *see also Reiter v. Cooper*, 507 U.S. 258, 269 (1993) (Primary jurisdiction allows a court to exercise its discretion to temporarily decline jurisdiction "so as to give the parties reasonable opportunity to seek an administrative ruling."). As explained above, Plaintiffs have no recourse before the Insurance Commissioner to raise any issue that could result in any action by the Commissioner affecting any of the insurance policies at issue in this case because they have already been "made or issued." HRS § 431:14-106(d).

For this reason alone, the doctrine cannot apply because there is nothing Plaintiffs can refer to the Commissioner. *Jackson v. Swift Ekrich, Inc.*, 53 F.3d 1452, 1458 (3d Cir. 1995) (Because plaintiff could not bring his claims before

the administrative body, no administrative referral was "feasible" and the

doctrine of primary jurisdiction cannot apply.).  Plaintiffs' lack of any recourse

before the Commissioner is in stark contrast to the cases cited by Defendant.

*Chun v. Employees' Retirement System*, 73 Haw. 9, 13, 828 P.2d 260, 262

(1992) ("[T]he regulations of the [Defendant] also provide for contested case

hearings."); *Hawai'i Blind Vendors*, 71 Haw. at 371, 791 P.2d at 1264 ("an

agency hearing is available"); *Kona Old Hawaiian Trails Group v. Lyman*, 69

Haw. 81, 91, 734 P.2d 161, 167-8 (1987) ("plaintiff did not avail itself of an

opportunity for an agency hearing").  This is simply not the type of case to

which the doctrine can be practically applied.

Even if Plaintiffs could obtain some form of relief from the

Commissioner, however, this case would not justify invocation of the doctrine.

Primary jurisdiction is a discretionary principle employed by courts to decline

to hear a case until after the resolution of complex factual issues within the

jurisdiction and area of expertise of an administrative agency.  *Kona Old*, 69

Haw. at 94, 734 P.2d at 169.  "The doctrine does not apply where a pure

question of law is at issue and technical matters not calling for the special

competence of the administrative expert are not involved."  *Aged Hawaiians v.

Hawaiian Homes Commission*, 78 Haw. 192, 203, 891 P.2d 279, 289 (1995).

Even the *Allen* case, heavily relied upon by Defendant, makes this clear. 59 F. Supp. 2d at 1230.  The *Allen* court deferred to the insurance commissioner on the issue of the correctness of the commissioner's approval of the defendants' percentage deductible but noted that if the issue were simply a question of statutory construction the outcome would be different:

> [P]laintiffs' claims here amount to a direct attack on the precise application of a deductible specifically approved by the commissioner, and ... statutory construction is not at issue.

*Id.*

As Defendant essentially admits in its memorandum, the central issues it has raised are purely legal and questions of statutory interpretation.   Defendant has identified no complex factual issues that are uniquely within the expertise of the Insurance Commissioner.

Unlike the authorities cited by defendant, this case does not involve rate making or an evaluation of the reasonableness of Defendant's rates in light of its claims history or any other factor generally within the Commissioner's area of factual expertise.  *See, e.g., Farmers Ins. Exchange v. Superior Court*, 2 Cal. 4th 377, 399, 826 P.2d 730, 744, 6 Cal. Rptr. 2d 487, 501 (1992) ("Inevitably, analysis of [Plaintiffs'] claim will require 'a searching inquiry into the factual complexities of [automobile] insurance ratemaking and the conditions of that market during the turbulent time here involved.'").  Plaintiffs simply allege that

Defendant valued Plaintiffs' insured property at an inflated amount in order to charge higher premiums.  The only factual question is whether Defendant's valuations were inflated.  This is hardly the sort of complex factual issue justifying invocation of the doctrine of primary jurisdiction that was present in *Superior Court* where the court explained:

> To address the People's claim, one must inquire into the insurer's ratemaking process in order to determine what the rate would be for a given driver without the discount. Thereafter one must discern whether the rate offered on a given Good Driver Discount policy is 20 percent below what the insured would otherwise have been charged. As we have observed, the question of insurance rate regulation has "traditionally commanded administrative expertise applied to controlled industries.

2 Cal. 4th at 399, 826 P.2d at 745, 6 Cal. Rptr. 2d at 502.

In contrast, property valuation is something courts regularly consider and resolve with little difficulty or need for the assistance of the Insurance Commissioner.  Thus, even if Plaintiff could bring the issue before the Insurance Commissioner, there is no justification for referral of this case where the only factual issues are well within the competence of the Court to decide.

### E.    Plaintiffs Have Standing To Pursue A Claim Under Chapter 480.

Defendant argues that the "Association of Apartment Owners" and "Board" are not "natural persons" and therefore have no standing under Chapter 480.  Mem., pp. 38-39.  Defendant misunderstands the legal capacity in which

the AOAO and Board have brought this action. They are acting on behalf of the individual unit owners as expressly allowed by statute. HRS § 514A-93. The Plaintiffs are natural persons who are simply being represented in this action by the AOAO and their Board. The policy of insurance names the individual unit owners as insureds. Mem., Ex. B, p. 27. Because the individual unit owners are named insureds under the policy, and Hawai'i condominium law expressly allows the AOAO and Board to bring claims on their behalf, this is an action by natural persons with standing under Chapter 480.

IV.    **CONCLUSION**

For all the foregoing reasons, State Farm's Motion to Dismiss should be denied.

DATED: Honolulu, Hawai'i, October 2, 2003

JEFFREY P. CRABTREE
ROBERT M. HATCH
Attorneys for Plaintiff

## CERTIFICATE OF SERVICE

I certify that a copy of the foregoing document was hand-delivered to the following persons at their last known address on October 2, 2003:

William C. McCorriston, Esq.
Jonathan H. Steiner, Esq.
Becky T. Chestnut, Esq.
McCorriston Miller Mukai MacKinnon LLP
Five Waterfront Plaza, 4th Floor
500 Ala Moana Boulevard
Honolulu, HI 96813

JEFFREY P. CRABTREE
ROBERT M. HATCH
Attorneys for Plaintiff